We'll begin with American Recycling vs. the Secretary of Labor. Good morning. My name is Mark Drew, and I represent the petitioner in this matter, American Recycling. And I'd like to make four points, please. The first is concerning the bloodborne pathogen standard. The citation here, I would submit the ALJ applied the wrong legal test. The test that he applied, which was incorrect, is whether an injury resulting in bleeding was reasonably foreseeable in woodworking activities. That is the incorrect legal standard. If you turn back, the phrase that causes a little bit of confusion here is in the definition of occupational exposure. They talk about foreseeable occupational exposure. And I would direct the court to the preamble. And in the preamble, OSHA gives examples of what they mean by foreseeable occupational exposure. They give the example of a surgeon operating on a patient. And during the operation, it's foreseeable that the ordinary duties of operating will bring you into exposure with blood. Yes, sir. Cleaning up blood after an accident, is that something different from a good Samaritan situation? Yes, sir. Here, that is not the ordinary duties of someone cutting wood is to cut the wood to build the pallet. This is not. There are other OSHA standards that deal with small tasks like that. Incidental or occasional exposure is not covered by the bloodborne pathogen standard. The standard is dealing with people who deal with routine and regular exposures because there are hazards that over time, if you're exposed consistently to blood, you have greater risk. Was there some evidence that this had happened on a number of occasions? There are. There are logs suggesting that. There is a log that suggested that there had been four prior injuries, but there's no discussion on the extent of the exposure or the measures that were taken. I would submit foreseeability of injury is not the legal test that was intended by this standard. The test here is what were your ordinary duties, and the ordinary duties of a surgeon is to work with blood. May I ask you a practical question? If we were to be persuaded by the argument you've just advanced but still find that the remaining citations were warranted, something I know you're about to dispute, what would the practical effect be of finding an error with respect to one citation? Well, there's dire consequences for a company on repeat violations. It's $125,000 for a repeat violation, and if the standard applies, there's a great deal of work that has to be done in terms of developing a program, developing procedures, training, providing hepatitis C vaccines. There's a great deal of work and a great deal of expense that's associated with compliance with 1910-1030, Your Honor. Let me ask you, you know, you had an incident where someone lost their hand in this. I assume you've put in some kind of standards and protocols in any event, no? Well, there are discussions about incidental exposure, and here what was done was exactly appropriately. They provided latex gloves for the cleanup, and they put a... All right, that gets to whether they're in fault. That was a little different from what I was focusing on, but it's not the primary concern, so let me let you go back to your argument. So I would submit that in terms of ordinary exposure, that is not met here. There are occasional injuries. OSHA understood that. In the workplace, every workplace has theoretically a courtroom you could have a paper cut. They did not intend this to apply to every single workman's stance. There are two other OSHA standards. 1910-151 requires you to be able to provide immediate medical care through a clinic or through an ambulance system, and 1910-132D requires you to evaluate the hazards of any task and to decide whether or not you need protective equipment. There are general measures in place, and they were applied with here. Did the company call on outside personnel to handle blood in the event of workplace injuries? Excuse me, sir? Did the company call on outside personnel to handle blood? They did for the disposal. When they had things cleaned up, they called in an outside third-party source, which is how it would be handled in the future. Why is that not a matter of foreseeable blood injuries? The individuals that are called in who specialize in work, that is their regular job duty, and they would be covered by this standard. Where is the evidence supporting that the company actually called in these people? That is in the record, sir. I can provide that. That is not in the record. Excuse me, sir? That is not in the record? It is in the record. It is in the record. Okay. So if there are these outside personnel, why did three employees clean up Mr. LeBron's blood in this case? Just someone's impulse at the moment that they're going to get blood there, just the impulse to clean it up. There is nothing more than that. So I would submit that the wrong legal standard, if you applied this standard, that it is foreseeability of any injury, then if you would look at the preamble, you would expect to see a whole range of other industries discussed, things like butchers, carpenters, woodworkers, all of those other industries. They weren't. What was discussed through the preamble are people primarily in the health care field, doctors, pathologists, morticians, people who have regular and ordinary job duties. And here where you have incidental job duties, this standard is not applicable. The second point I'd like to turn to deals with whether there was a risk of an explosion hazard in the workplace. It's indisputable evidence that there are five elements that must be present in order to have a dust explosion to occur. And in this case, OSHA failed to offer any proof as to two of those five elements. The quantity of dust that's required, both on the expert documents that were put in, the NFPA documents and our own expert, is that you need a minimum volume of dust that is one inch thick, covered over 1,000 square feet. And there is no evidence here that that threshold quantity of 1,000 square feet surface area was ever introduced into evidence. If you look at the four little piles that OSHA had photographs of, you might have something that's 18 inches by 4 inches, which is a little less than a half of a square foot. The industry standards say you need at least 1,000 square feet. So the evidence is off by a factor of 2,000. In addition to that, when you look at the judge's discussion, he quotes an NFPA 664 document that has a two-part requirement, that you need a pile that's an eighth of an inch thick plus 1,000 square feet. He excludes, he just ignores in the quote the second half, that's 1,000 square feet. So without this combined combination of depth and surface area, you don't have enough fuel to have an explosion. There is no evidence in the record on that. Was there not evidence that at times, based on employee interviews, that the wood dust would sometimes light up on fire alone? There is one instance where there was a very, very small fire that was able to be carried outside. But you just said that there was no evidence. So there is evidence. I said fuel, Your Honor. I was arguing over fuel. There's five components. You need fuel. You need a minimum explosion concentration. It was based on the combustibility of the wood dust. That was the basis for the finding. Your Honor, combustibility of wood dust alone is insufficient to establish an explosion hazard. Mr. D'Onofrio's inspections report all five elements of the dust explosion pentagon. So I'm just highlighting that because you're saying that there had to be fuel, and I'm saying the wood dust was combustible. That was the basis for that part of the finding. And I'm not sure I understand your response. No, ma'am. There is a scientific test that a small portion of the dust was combustible. They run it through a series of tests. But beyond that, once you have that test, you still need a threshold quantity of a sufficient amount in order to have. It's not just whether the few grains that are tested are explosive. You need a sufficient quantity. You need an eighth of an inch pile by 1,000 square feet. So just in terms of volume of dust, there was inadequate volume. As to the minimum explosion concentration, that's another element that's required in order to have an explosion. There was no proof offered by the government, none, as to what is the explosion. Why isn't D'Onofrio's testimony substantial evidence? There simply isn't evidence of a minimum explosion concentration. But he documented multiple instances of excessive combustible wood dust buildup. No, what I'm saying is that a minimum explosion concentration is measured in 40 grams per cubic meter. That's the standard measure for a minimum explosion concentration for a wood dust. And our expert pointed out that that evidence. He was just wrong, but is that for us to decide? There is, if you look at all the definitions in the record, the definition was ignored. So, yes, there's a significant error factually in the record. And I would submit that when you look at. No, I'm not sure I understand that. I was looking at Mr. D'Onofrio's testimony at four places in the record. The Joint Appendix 108 through 13, 266 to 267, 285 to 86, and 294. And those are instances where he documented excessive combustible wood dust buildup. What was the error in his analysis that was such that the agency could not rely on his testimony or on his evidence? The two errors that he made are as follows. The first is the quantity of dust. Just the mere presence of a little bit of dust. He has four small, tiny little piles. Just that is inadequate dust in order to cause a dust explosion. The second error is that the dust has to be aerosolized and it has to be airborne so that it's spread out over a cubic meter of air. Our expert explained that you needed a minimum explosion concentration. This has to be aerosolized so that propagation can occur. And there there was evidence that significant dust was present on ceiling joists, that there was a leaking dust collector bag that had dispersed it into the air, and the dust was located in a confined space. So that evidence was some proof that this had become airborne, wasn't it? I mean, I know you're arguing that different inferences should have been drawn, but we can only reverse if there was no way that the agency could have made these findings. There is no way that this finding is supported by the facts in this record. The judge said at some time there was some evidence of airborne dust. His conclusion in that opinion is error. The fact that it's at some time ignores the fact that the five elements that cause an explosion have to occur simultaneously. You have to have all five at the same time. You have to have the airborne fuel. You have to have the right ignition energy. You have to have the appropriate confinement. Your argument, as I take it, or as I understand it, is that Mr. D'Onofrio, in this case, had to provide some evidence relating to all of those things in order to substantiate the citation. The government had to put that together in its entire case, yes, sir. Those are the fundamentals of an explosion, and it didn't occur. There is no evidence. The other major error— You say there's no evidence. It would be more helpful if you told us why the evidence is inadequate, because Mr. D'Onofrio's findings were one inch in depth on the ceiling bar joints, half an inch and then in another place three inches on the southwest corner frame of the dust collector, and a quarter inch to an inch on the frame of the panel saw. Now tell us why that evidence was inadequate, not there's no evidence. That evidence is inadequate because you have to show that there is a volumetric calculation, that the dust is spread out over— Is that required? That is required in two places. In NFPA 664, if you go through their discussion, and our expert testified the same, and our expert testified— By the way, is the NFPA standard a standard that the Secretary has ever adopted as a form of regulation? It is not an OSHA standard, that is correct, but it is the industry standard for articulating how a dust explosion occurs and what are the required elements for an explosion. All of the technical information for an explosion is set forth in NFPA 664, and if you look at the elements that are discussed there, you can see where the government failed to make its burden of proof. There is the requirement that only when it reaches that level can the government say you're in violation of the housekeeping standard. I mean, I wouldn't assume that you're really suggesting that it has to reach the point where if a spark flies, the place will go up in flames, that only at that point can OSHA do anything. The company had daily procedures which are consistent— Answer my question. Where is the requirement that OSHA cannot act until what you construe as the NFPA standard is reached? The OSHA has—the Supreme Court has defined it that OSHA has the authority to act when there is a significant risk of harm, and the NFPA standard builds in all of the risks associated with that. You do not have to—under the NFPA standards, it is a hazard not when you reach the full minimum explosion contravention. It's when you get to 25 percent. There are all sorts of safety measures built into that standard, and when you look at the safety standards built into NFPA standard, this workplace never approached those unsafe conditions. You're saying that the—I just want to make sure that I understand your argument. Are you saying that the Labor Department is bound by the NFPA standard? If we are going to be dealing— Yes, is that your position? To prove—yes, sir. To prove the existence of an explosion hazard, there has to be some sort of technical evidence or data, and then you have to have the evidence to show that that standard is met. And when you measure what is offered by the NFPA standard, we had a safe workplace. Dirty in a few places, there was some dust, but it never rose to the hazard of being an explosion hazard. The risk of an explosion did not exist in this workplace. All right. You've well passed your time, Mr. Drew. Thank you very much. Thank you. We'll hear from your adversary. Good morning. May it please the Court, my name is Brian Broker. I'm counsel for the Secretary of Labor in this matter. On December 3, 2012, Mr. Stephen LeBron suffered an amputation injury to his left hand while operating American Recycling's pop-up saw. The injury occurred when a coworker stepped on the foot pedal that was unprotected and powered the saw's blade while Mr. LeBron was positioning wood on the saw in preparation for a cut. This injury occurred even though multiple supervisors and managers knew that the saw was in a hazardous condition. And they did nothing about it, and they required employees to continue using the saw until catastrophe struck. I'm sure you've got more, but would you address the two issues, the blood pathogens and the fire? Absolutely. Happy to. First, the bloodborne pathogen standard. The bloodborne pathogen standard makes clear in 1030B what occupational exposure means. Now, American Recycling has repeatedly attempted to add adjectives to the definition of occupational exposure. It means reasonably anticipated contact with blood or other potentially infectious materials in the course of an employee's duties. Now, it doesn't mean it has to be frequent. It doesn't mean it has to be routine. It doesn't mean it has to occur normally. What it means is that there's a factual determination that the Court has to make as to whether this employer could have reasonably anticipated that their employees would have to come in contact with blood as a result of a job duty. In this case, that job duty is cleaning blood. Does that apply whenever a job involves someone working with sharp objects so that an accident could result in a blood-generating injury? Not necessarily. I didn't think so, and so it's not clear to me why this is different. Help us out. Sure. The reason that the ALJ in this case found that the Bloodborne Pathogen Standard applies is first looking at the nature of the work, looking at woodworking and what they do. And in this case, they used saws and they used materials that are likely to cause cuts and scrapes and other injuries that are likely to cause bleeding. They then also looked at the injury logs and noticed that they had had four injuries over the previous two years, which likely resulted in bleeding and then would presumably have required someone to clean some blood up. And then most importantly, we know that after Mr. LeBron's injury, employees actually did clean blood as part of their job duties. There's a pool of blood around the saw, there's blood on the saw, and rather than having a third party clean that blood, they took it upon themselves. The preamble does suggest that when you have, you know, an occasional accident, that that should not be covered because it would be needlessly burdensome to require all employers to be ready for contact with blood and other infectious materials. Why doesn't that apply here? Well, the preamble makes this distinction between a Good Samaritan Act and one that is reasonably anticipated, and I think that's what it's getting to. The Good Samaritan Act being when an employee voluntarily comes to the aid of another injured employee in order to provide them first aid. In that instance, they're not performing any work that is part of their job duties. They're simply just acting as a good coworker would. What's different is that in this case, these are maintenance employees who worked for the plant manager, and although injuries may or may not have been infrequent, they were nonetheless reasonably anticipated based on the nature of the work that the company is involved in and its history of injuries that involve bleeding. It could have foreseen that this is a task that its employees would be asked to do. I'm not sure that you're doing anything other than offering us conclusions about that. There might be a way of looking at this that suggests they're working with such dangerous equipment that you're not likely to have minor scrapes and bruises. If this equipment is not used safely, you will have the kind of terrible accident that we're talking about here, and that seems to have been fortunately not the case, that this was a typical occurrence. So you've got four incidents where the logs show laceration-related injuries, but what you say about that is they likely caused bleeding. You have no evidence that they did cause bleeding or that anyone at the workplace was required to clean up blood. So we have this one incident, and now you're saying they're in violation of the pathogen standard. What am I missing about this scenario? I think the point is the ALJ inferred that cleaning would have to occur after those four incidents. From what? Because of course he can infer things if there's evidence to support that inference, but from what? I suppose it's from the nature of the injuries, from the descriptions. There's one injury in there where an employee missed 51 days of work due to a laceration from using a dismantler. It sounds like a very serious injury, and from that and from the other testimony about what kind of work they were involved in from the compliance officer, came to the conclusion that this was probably a serious injury, looking also at the injury that Mr. LeBron suffered was a serious injury. Are we clear that it's a serious blood injury? That is an inference that the ALJ made. And why would we allow such an inference when obviously there are ways of finding out? I mean, it wouldn't be that difficult. Otherwise we're holding this employer in violation of a blood pathogen standard. Well, right. I think I would just circle back to the point that even if cleaning of blood didn't actually occur after those events, there was still notice then to the employer that they would reasonably anticipate that there's going to be blood spilled at their facility, and it could require someone to clean it up. But, you know, your instruction, OSHA's instruction, is that occupational exposure analysis has to be fact-based and tied to the tasks and procedures associated with particular employees. So I'm trying to see what we've got here that satisfies that. Right. The individuals who cleaned the blood in this occasion are the plant manager and then also two maintenance employees. And maintenance employees clean things, and that's how the ALJ reached this conclusion that after looking at the response to Mr. LeBron's injury, it's incumbent upon these individuals to clean the blood. Now, there aren't formal job descriptions for these maintenance employees that say they shall clean blood, but we can infer from the circumstances and how they responded to an actual industry that the responsibility fell on them. As the ALJ said, American Recycling can't escape a responsibility for this by not having anyone designated to clean the blood after a bleeding injury. And one other point I'd like to make is that the preamble does say, as we discussed in our brief, the preamble removed language from the proposed version of the rule that would have limited the definition of occupational exposure, but in response to comments which said you're going to want to cover incidents that, while infrequent, could nonetheless be reasonably anticipated, the secretary agreed it removed that language. So it's contemplated this very scenario. How about the dust? The dust next? Okay, sure. So the dust, there's been some confusion about the dust here. To begin with, there's been a lot of talk of NFPA 664. What that is is an advisory industry standard. So it's not required to prove the elements of that custom advisory industry standard in order to sustain a violation. It's something that the ALJ looked to in order to provide additional evidence that the amounts that were testified to by Mr. D'Onofrio and were measured and were captured in photographs were, in fact, significant and excessive. So whether or not the ALJ used it, to the T, is there a more specific standard than significant and excessive? That is the terminology that is developed for the case law. Because this is the housekeeping standard, remember. So the housekeeping standard requires that workplaces be kept clean. That takes us to an objective reasonability test to determine whether or not the evidence supports that the employer failed in that regard. In this case, it's abundantly clear that they did. Compliance officer D'Onofrio's testimony makes that clear, as does his photographs, as does the admissions from Mr. Meindl, the vice president of the company, and Mr. Santiago, the president of the company, that they had problems with their dust collection system, that it leaked, that dust would fly off. The argument is that there was insufficient evidence in the record of the quantity of dust, that the appropriate levels weren't there. Sure. Is there evidence of the quantity, and what does that evidence show, and is that enough? Well, on its own, the compliance officer's testimony about the amounts, and having covered all the five evidence as we discussed, and being shown in the photographs, all shows us, as well as the previous fire that occurred at the workplace, it all gives us evidence to support that the accumulations were, in fact, significant enough to create these hazards. Now, the NFPA-664 use also does not fail. It is also evidence of this violation. That is because you don't have to have precise measurements to establish that one-eighth inch layer of dust exists. This is clear from the A.E. Staley manufacturing case. The commission used photographs to determine that the accumulations of dust were excessive in that instance. By looking at NFPA-664 and its Annex A, which gives us explanatory information about how these things are supposed to be used, it tells us to look at all the dust in the facility. You need to look at the ceiling joists. You need to look at the dust on the walls, on the equipment. All of this comes together to build that one-eighth of an inch dust layer, because what we're really concerned about here is that something's going to disturb the laying dust and suspend it in air, which is going to create a dust cloud and potentially an explosion. So when you look at all of the dust that has been captured, particularly in the photograph, there's Exhibit 3 in the record is a great photograph of the ceiling joists. It's very clear there are heavy amounts of dust on these ceiling joists. That alone is sufficient to cover this 5% surface area criteria, because as NFPA-664's Annex tells us, as an engineering principle, accumulations on ceiling joists cover 5% of the surface area, and for steel beams it's up to 10%. So looking at that one-inch accumulation alone, the surface area criteria would be covered under that. Additionally, it should be remembered that this is concerned with the potential for explosion hazards as well. So the concern is not that you don't have to show that the dust is already floating in air. We're talking about the conditions that are likely to give rise to this kind of hazard. So the NFPA-664 says in Annex A that only 50% of a one-eighth-inch layer is really actually necessary to become suspended in order to create an explosion for most dust. So we need to keep in mind... You keep referring to the NFPA, but what you're really telling us, because I'm listening to you carefully, is it doesn't really matter what the NFPA says in one sense. We've got a housekeeping standard, and Mr. D'Onofrio described the circumstances under which the dust might create a real hazard. Yes, sir, I agree. So in addition to... No, no, please. Okay. It's just that your time has run out, so I wanted you to start to wrap up. Okay, sure. I'll just wrap up by saying that substantial evidence clearly supports that the two machine-guarding violations were willful in this matter. It was clear that the company had heightened awareness that the pop-up saw moved and walked prior to being anchored to the ground. It's also clear that the company had heightened awareness that the foot pedal was not protected against accidental activation. Despite awareness of those hazards, they did nothing to correct those issues or to eliminate exposure to those issues. Rather, they required their employees to continue using a defective piece of equipment. That alone substantiates a willfulness characterization of these violations. On top of that, we have a wealth of general evidence here that shows us that the company was, generally speaking, indifferent or dismissive or nonchalant about safety in its facility. It simply didn't take safety seriously, and it didn't respond to these problems in time to prevent catastrophe. So we ask that these be affirmed, all of these violations. Thank you. Thank you. The rebuttal was waived, so we'll take the case under advisement and try and get you a decision as soon as we can. Thank you.